# CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed December 11, 1920.

MARIE M. MARTIN
VS.
ROBERT J. MARTIN.

*John Philip Hill* for plaintiff.
*Benjamin H. McKindless* and *Frederick V. Reinheimer* for defendant.

DAWKINS, J.—

The divorce a mensa et thoro is sought on the ground of cruelty which forced the plaintiff to leave the defendant. The cruelty consists chiefly in one instance on the boat coming to America, when she was playing the piano, the defendant pushed or grabbed the wife or shook her and told her not to make a fool of herself, and on a second occasion, when she was combing the hair of a doll, he took it from her and made an unkind remark. She also says that instead of bringing her into a home of their own, as he promised to do, he brought her into the home of his parents, where his people were disagreeable so that nobody was able to get along with them. The plaintiff has not gone into the details of the life in the home except in a general way. The mother said she and her daughter did not get the proper amount of food. Whatever promise was made, we cannot deal with the unfortunate status of the mother of the plaintiff. There may be another tribunal which may determine the rights growing out

of the promise to take care of the plaintiff's mother as well as herself, but we can only deal with the affairs of the husband and wife in this case.

Much of the testimony and much of the discussion has been directed to a condition that brought about the marriage—what is commonly called the "courting" period. None of those promises have shown any direct misrepresentation; however, much was written before and after marriage about his providing their own little home. That was all done away with when it was made plain to the plaintiff before she was married and before she came to America that she was expected to come and live in the home of the husband's father and mother. This is an unfortunate case, like a great many others, in which there are too many relatives on both sides. The young man should not have married and agreed to bring her to America if he had any objection to the wife's mother. On the other hand, I suppose the wife should not have married him, even at the last minute, when she knew he expected to bring her to the home of his parents, unless she was willing to endure, but no court can make what is commonly called "in-laws" of one acceptable to the other. Someone has said that it takes a very small house for two people, but a very large one for three: so these situations, unfortunate as they are, cannot be helped. It would have been a most remarkable thing for people of different nationalities, the love-making having been carried on under the influence of war-time conditions, to have come and lived in peace with the mother of each of them. Now, the obligation is always, of course, upon the husband to take care of the wife. Each case must be determined by its own surrounding circumstances. The circumstances of this case are such that it is almost impossible to tell who was more in fault. It has been clearly established that the wife was gay and fond of social life, while the husband was quiet. Under the laws of Maryland there are only three causes for divorce a mensa. I do not think the attitude of "cold anger" complained of could be interpreted as cruelty. The other circumstances of holding and "shaking," while not justified, whether it was about snail-cooking or combing doll's hair, were lived down, for after

they got to America they lived together happily for several months. The head-butting incidents, done perhaps as stated, to make his wife have sympathy for the husband, certainly should not be construed as any cruelty to the wife. Self-torture would not in any way indicate to my mind that it was a cruel thing to do to the wife, to try to invoke her sympathy. These are practically the only suggestions of cruelty, except possibly the evidence of allowing the wife to stay in the house without speaking to the husband, and shaking her and grabbing her by the shoulders. No one says that there was any hitting in any way. He shook her. she says: he said he held her and that she hit him. I do not recall that she denied the actual passing of the blow towards him. However, I do not believe, judging from her appearance, that she could hurt him by striking him. That is all the cruelty in the case, and relief on that ground cannot be granted.

On the question of abandonment, under all cases in Maryland, some real or definite intent to desert at the time of the abandonment must be shown. There is some contradiction in the evidence; practically all of the testimony of the plaintiff is that of the wife and her mother, whilst the defendant's testimony is chiefly that of the husband and his relatives. The actual testimony in regard to the desertion seems to be that the husband did go into the room after some separation, and he did try to talk to his wife, and she has not, to my mind, satisfactorily denied it, and he talked to her and she turned away from him, and, finally, in the night-time, he went up to the third floor to sleep. The testimony is uncontradicted that he did remain apart from her then for at least several weeks. Then there was a note sent that the wife was ready to receive him, and an interview took place: as to what happened at that interview the testimony is conflicting. At any rate nothing developed to indicate that that was a final separation, because the plaintiff did stay a while longer in the house, although the parties did not live together as man and wife. The final act of separation took place when the defendant nor any of his people knew it. The wife and her mother left the house apparently when

the other members of the family were at a meal. That would seem to be the moment of desertion. It is true the husband does say he went to see her as many as three times. The final time she was to let him know definitely what she would do, and later she said she would not live with him if he were a millionaire. She might have been perfectly justified, but, at the same time, the wife left the husband with no immediate compelling cause. There is a very unfortunate situation in this case. When he met the plaintiff in France the defendant already had a wife, and he came back to America and got a divorce. I cannot help believing that that divorce was arranged for and that he came back to America for the purpose of getting it, but I must believe, too, that the wife knew that was to be accomplished. The court is well satisfied that the love-making was of so strong a character that the wife even advised the divorce so that the defendant could marry her. She must have connived at it, for the brother says she discussed it with him. While I do not want in any way to approve of the attitude of the brother, for his testimony should be taken at a discount on account of his conduct on the stand, yet he did say—and it has not been contradicted—that she did discuss with him the possibility of "Bob" getting a divorce, so the question of obtaining a divorce was known to her. The defendant came back and obtained the divorce in an unusual way, which, unfortunately, we cannot deal with in this case. The plaintiff was in no way deceived in that regard, for she knew all about the divorce. This plaintiff and her mother were not really welcome guests in that home. They were hardly welcome to sit down at the family table, but I cannot help believing that there must have been some food or provisions in the house. I do not believe that the parents of the defendant would put themselves in the position of starving these people out, and considering the plaintiff's own testimony, it does not indicate that they left because the larder was depleted as charged.

To establish constructive abandonment there must be some overt, definite, positive act that caused it. We cannot say one is justified in leaving the other unless there is something shown to establish the impossibility of the parties continuing to live together under the same roof. There is nothing shown that the defendant did that would in any way compel the plaintiff to leave him. There might have been abundant cause for it. He should not have taken his wife, a French girl, away from her own country and bring her here and inflict her on his own people, but he did that and should be held responsible for it. It is reasonable that the wife wanted to take care of her mother; she wanted her mother with her, but when they married they should have followed the scriptural precept of leaving all others and clinging only to the one he or she had married. She said he promised to make her a home for herself and her mother. If he agreed to do that, then I suppose there ought to be some remedy, but the remedy cannot be found in this case—neither cruelty that would justify the abandonment or actual abandonment has been shown. The court feels compelled to dismiss the bill, entirely without prejudice, for the reason that the case has not been proven. I do not think that the plaintiff has shown sufficient evidence to justify the granting of the relief she seeks in this case. Therefore, if the arrearages of alimony are paid to date, I will be prepared to sign a decree dismissing the bill without prejudice to any further action the wife may have or any action she may think she has a right to pursue.